# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>224 Sea Cliff Avenue<br>San Francisco, California | )<br>)<br>) Case No. 3　14　7 0 7 3 1<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Section 1341 | MAIL FRAUD |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeremy Desor　/ Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-27-14

*Judge's signature*

City and state: San Francisco, California　　United States Magistrate Judge Jacqueline Scott Corley
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT, AND SEARCH WARRANT

I, Jeremy Desor, being first duly sworn, hereby depose and state as follows:

A.  Introduction and Agent Background

1.  I make this affidavit in support of the following: a Criminal Complaint and Arrest Warrant against LUKE BRUGNARA, who is believed to reside at 224 Sea Cliff Avenue, San Francisco, California (the "Target Residence"), and an application for a warrant to search the Target Residence and attached garage. As set forth below, there is probable cause to believe LUKE BRUGNARA has committed mail fraud, in violation of Title 18, United States Code, Section 1341.

2.  I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for approximately ten years. I am currently assigned to the San Francisco Division of the FBI. As part of my assigned duties, I investigate possible violations of federal criminal law. I have worked in the Chicago Division of the FBI and the San Francisco Division of the FBI. In each of those offices, I have been assigned to squads that focus on the investigation of white collar crimes. During my career as an FBI agent, I have participated in more than 30 such white collar investigations, and I have been the lead or co-lead agent in more than 20 of those investigations. I have also worked in the Economic Crimes Unit at FBI Headquarters with program management responsibilities relating to white collar programs.

3.  This affidavit is based on my personal knowledge and information obtained from documents, witnesses, and other law enforcement officials. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint against BRUGNARA and an application for a search warrant. As such, this affidavit does not include all of the information that I acquired while participating in this investigation.

4.  As discussed in more detail below, this investigation has shown that BRUGNARA has engaged in a scheme to defraud Victims 1 and 2 by representing he had the means and intent to purchase approximately $11 million worth of art from them. BRUGNARA took possession of the art and then refused to pay for the art or to return the art.

B.  Probable Cause

5.  I met with Victim 1 on May 2, 2014. In summary, Victim 1 told me the following:

    a.  Victim 1 is a private art dealer who stores her art in a storage facility operated by "Cirkers" in New York, New York.

b. Victim 1 was introduced to BRUGNARA through a friend about 10 years ago. The friend made the introduction because BRUGNARA was interested in purchasing fine art.

c. Shortly after meeting BRUGNARA, Victim 1 sold a painting by Pierre-Auguste Renoir to BRUGNARA for approximately $500,000. BRUGNARA put up earnest money of $50,000-$100,000 and the painting was shipped to third-party "ShipArt" in San Francisco. The painting was held by ShipArt for inspection by BRUGNARA, who then paid the remainder of the purchase price and took possession of the painting.

d. Victim 1 subsequently sold a Picasso drawing to BRUGNARA. This transaction was handled in the same manner as the first with an earnest payment and the work being shipped to ShipArt. This transaction was completed without any problems.

e. In or around February 2014, Victim 1 was seeking to sell certain pieces of art. Victim 1's friend who had introduced her to BRUGNARA reminded Victim 1 that BRUGNARA was always looking to purchase art. After not having been in touch with BRUGNARA for several years, Victim 1 contacted BRUGNARA to determine if he would be interested in purchasing additional pieces.

f. Victim 1 told BRUGNARA about a sculpture by Edgar Degas and a George Luks painting. BRUGNARA claimed he was interested in both pieces, and ultimately the parties agreed to a price of $3 million for the sculpture and $450,000 for the painting.

g. BRUGNARA asked Victim 1 if she had any additional pieces for sale. In the meantime, Victim 1's friend and fellow art dealer Victim 2 had talked to Victim 1 about 16 paintings by Willem de Kooning that Victim 2 possessed. Victim 1 could not afford to purchase the paintings but asked Victim 2 if he wanted Victim 1 to offer the paintings to BRUGNARA. Victim 2 agreed to have Victim 1 offer the paintings to BRUGNARA.

h. Victim 1 informed BRUGNARA the 16 de Kooning paintings were available and BRUGNARA advised he wanted to purchase the paintings along with the Degas sculpture and Luks painting. An invoice dated April 7, 2014, for the de Kooning paintings reflects a total purchase price of $7,325,000 for the 16 paintings.

i. Victim 2 suggested Victim 1 also gauge BRUGNARA's interest in purchasing a drawing by Joan Miro and a group of etchings by Picasso. BRUGNARA agreed to purchase these items as well, with invoices dated April 7, 2014 reflecting prices of $160,000 for the Miro drawing and $145,000 for the Picasso etchings. In all, the purchase price for the artwork in this transaction totaled $11,080,000.

j. Victim 1 asked BRUGNARA to provide an earnest payment for the works of art. BRUGNARA told Victim 1 that he did not feel he needed to provide an earnest payment given their successful transaction history. BRUGNARA told Victim 1 that he

frequently bought high-priced art pieces.

k. Victim 1 consulted with Victim 2 and they agreed to proceed with the transaction without an earnest payment. Under the terms of the transaction, BRUGNARA was to have five business days to inspect the art and either make payment or return the items he did not want.

l. The art was packed into five custom crates and shipped from New York to the address provided by BRUGNARA, 224 Sea Cliff Avenue in San Francisco (Target Residence), for delivery on April 7, 2014. Victim 1 traveled to San Francisco on April 6, 2014 so she could be at BRUGNARA's residence when the art arrived.

m. Victim 1 went to BRUGNARA's residence on April 7, 2014 and witnessed the arrival of the five crates of art. BRUGNARA seemed surprised to see Victim 1 at his residence although he was expecting the delivery of the art that day. BRUGNARA instructed the delivery personnel to leave the crates in his garage. Victim 1 had never before seen anyone request art of such value be placed in a garage.

n. Victim 1 entered the Target Residence and observed it was almost empty with the exception of two chairs. There was no artwork in the house. BRUGNARA told Victim 1 that he and his wife were back-and-forth between two houses at the time.

o. Victim 1 had special tools designed to open the crates so the artwork could be inspected by BRUGNARA in her presence. BRUGNARA told Victim 1 that he did not want to open the crates that day. BRUGNARA said he was very busy and had not been expecting Victim 1. BRUGNARA said he had another appointment, and a male individual arrived shortly thereafter. BRUGNARA told Victim 1 he needed to meet with the individual and would call Victim 1 later to arrange a time to open the crates and inspect the artwork. Victim 1 reminded BRUGNARA that there was only a five-day window in which to complete this process.

p. Over the next two days, Victim 1 contacted BRUGNARA on multiple occasions. Each time, BRUGNARA told Victim 1 that he was very busy and that Victim 1 was inconveniencing him. BRUGNARA insulted Victim 1 repeatedly and would not agree to have Victim 1 come back to his residence to open the crates.

q. Victim 1 went to BRUGNARA's residence on April 9, 2014 to try to confirm the five crates of art were still at the residence. Victim 1 looked into BRUGNARA's garage through a small window and viewed a car in the location where the crates had been when Victim 1 left the residence on April 7, 2014.

r. During a phone call on April 9, 2014, BRUGNARA told Victim 1 that she would have to deal with his attorney going forward. Victim 1 consulted with Victim 2, who obtained a reference for a San Francisco-based attorney. Victim 2 ultimately retained

HS as his attorney.

6. Victim 1 and BRUGNARA communicated by email throughout the negotiations for this transaction. I have reviewed some of the emails and found the following:

   a. In an email dated March 23, 2014, Victim 1 wrote to BRUGNARA, "The price [of the de Koonings] as a group, all 16, is $7,360,000.00…The Picasso's [sic] are $145,000 for all of them…The beautiful George Luks…is $450,000…"

   b. Later on March 23, 2014, BRUGNARA wrote to Victim 1, "…I will buy all of the paintings and put them in my museum…i [sic] will need a discounted price…You will need to send the paintings to me at 224 Sea Cliff Avenue, SF, CA 9412 [sic] so I can inspect them…Luke." Victim 1 told me she later asked BRUGNARA about his museum. BRUGNARA initially told Victim 1 that he was building a museum in San Francisco. When Victim 1 responded she was not aware any new museums were being built in San Francisco, BRUGNARA said his museum was actually in Las Vegas.

   c. Victim 1 responded to BRUGNARA by email on March 24, 2014 and asked, "Do you only want the Oils or do you mean any drawings and etchings also?" BRUGNARA responded that morning, "…I mean all the art pieces…including the etchings and the bronzes…I need you to send everything to me. Luke"

   d. Later on March 24, 2014, Victim 1 wrote to BRUGNARA, "Thanks for your confirmation that you will purchase the 16 De Kooning oil paintings…I am really pleased they will be in your museum so that the public will be able to enjoy these wonderful works of art…I spoke with my partner…He agree [sic] to a 10% discount since the paintings will go to a museum. He asked for a down payment of $500,000…(Miro ink drawing, I reduced to $160,000)…I will write you separately on the Degas…"

   e. BRUGNARA responded to Victim 1 on March 24 by writing, "…I am not going to pay for any shipping costs or deposit…I have never paid for such costs..I have been a trusted client for over a decade. Luke." Victim 1 replied that day, "I understand your reasoning, but the investment my partner has involved, causes a fear of sending the De Kooning's [sic], without any ernest [sic] payment…I trust you to send you my Degas…and for you only…$4000,000.00 [sic], to you…The last original was $20,000,000.00…that is how much I trust you, then I could pay the ernest [sic] money to my partner…" BRUGNARA responded that day, "…perhaps you can send at least a few of the de Koonings…regarding the degas [sic], please email me now the pictures and provenance. Luke," which Victim 1 did on March 25, 2014.

   f. Also on March 25, Victim 1 wrote to BRUGNARA, "I took out another floater insurance policy and will send you the De Kooning's [sic]…I will send [the Degas] next…I hope you are sincere, because, everything involved is extremely expensive to me…" BRUGNARA responded that day, "Thank you. I look forward to putting

them in my museum."

g. On March 26, 2014, BRUGNARA wrote to Victim 1, "Please let me know the estimated date of arrival of the paintings and bronze..." On March 27, Victim 1 wrote, "My packers at Cirkers are busy crating and collecting all the pieces of Art...You will probably receive them by April 7th.  I thought I might fly down and help you or even show you the best arrangement for the De Kooning's [sic]...I would also just like to see they all arrive as usual, perfectly!  Which hotel is closest to your Museum site?"

h. On March 28, 2014, Victim 1 wrote to BRUGNARA, "The crating will be finished...on the 2nd. [sic] in order for a safe journey to you, by the 7th.  Please give me the exact Museum address..." BRUGNARA responded that morning, "As I stated to you previously, send the pieces to:

Brugnara Properties
224 Sea Cliff Avenue
San Francisco, CA 94121

The shippers can coordinate delivery by calling me (415-871-8011) directly and there will be someone from Brugnara Properties present to assist them..."

i. On April 1, 2014, Victim 1 wrote to BRUGNARA, "...the Works of Art will be leaving today.  All the De Kooning's [sic], Degas, Picasso's [sic], and Luks will arrive on the 7th of April...I will be in San Francisco, 10 minutes away from your location; I especially wanted to see the crates and know all is well and also to see your happiness when viewing each piece..." BRUGNARA responded to Victim 1 that day, "...You can arrange unloading/moving with Shipart International..I do not have the staff to unload those pieces.  Luke."  The next day, Victim 1 wrote to BRUGNARA, "My Truckers will remove the crates into the protected area you wish, at 224 Sea Cliff Avenue..."

7. I have talked with Victim 2's attorney HS and reviewed emails between HS and BRUGNARA and BRUGNARA's attorney, RK.  The information I learned from HS and the emails is summarized below:

a. Victim 1 contacted HS on or around April 9, 2014.  HS took the lead in communicating with BRUGNARA and later RK.

b. On April 9, 2014, HS sent an email to BRUGNARA in which he wrote, "[Victim 1] has requested my assistance in connection with your pending purchase of certain artwork...She is at a loss in trying to make sense of your communications with her...You of course are familiar with the terms of the art acquisition...It is imperative that we hear from you tomorrow morning.  Feel free to have your counsel contact me with your intentions, though I don't think lawyers can add any value at this point.  Either you want to conclude the transaction as contemplated and documented, or you

don't."

c. BRUGNARA responded to HS on April 9, 2014, "...Your email is based upon a fictional story told to you by [Victim 1], who has a well-published history of art fraud, as documented on the internet by her victims. In short, what [Victim 1] has communicated to you is false. I told her yesterday to communicate with my attorney..."

d. HS later began communicating with RK. HS explained the art transaction to RK, who stated he would check with his client and get back to HS. RK later communicated to HS that BRUGNARA's position was the artwork in question had been given to BRUGNARA by Victim 1 as a gift. HS summarized this in an email to Victims 1 and 2 on April 10, 2014, "[RK] called. He talked to Brugnara. Brugnara told [RK] that [Victim 1] presented these works to him as a 'gift,' that they are unauthenticated and not worth much..."

e. On April 10, 2014, HS sent an email to RK in which he wrote, "...That Mr. Brugnara would tell you there art works were a 'gift' is the most bizarre thing I have ever heard in my legal practice..." HS attached a set of invoices relating to the transaction for RK's review. RK continued to insist BRUGNARA's position was the artwork was given to him by Victim 1 as a gift.

f. HS then began working with RK to draft a "Sworn Affidavit" for BRUGNARA's signature and a "Confidential Agreement and Mutual Release." These documents were intended to lead to BRUGNARA's return of the artwork.

g. On April 11, 2014, HS sent a draft affidavit to RK. In the draft, HS wrote, "...On April 7, 2014, __ [4?] crates of artwork from [Victim 1] Fine Art were delivered to [BRUGNARA's] Property..." HS explained to me that he included a "4" with a question mark because at the time he was not sure if there had been four crates or five crates. On April 15, 2014, RK emailed a revised version of the affidavit to HS. This version included the proper number of crates (five).

h. As the negotiation over the language for the affidavit and release dragged out, HS asked RK to go to BRUGNARA's residence to confirm the five crates were still present and take measurements of the crates. RK reported back to HS that BRUGNARA had only received four crates.

i. On or around April 24, 2014, RK sent HS an email with photographs and dimensions for the four crates he observed at BRUGNARA's residence. According to Victim 1's attorney, Victim 1 did not recognize at least one of the crates in the photos as being part of the five crates that were delivered to BRUGNARA on April 7, 2014. With BRUGNARA claiming he had only received four crates, HS determined there was no use in moving forward with the affidavit and claim.

8. Victim 1's attorney provided me with images of a text-message exchange between Victim 1

and the telephone number 415-871-8011, which Victim 1 represented was the number through which she communicated with BRUGNARA. A database check I conducted linked this number to BRUGNARA through utility records. This is also the phone number BRUGNARA provided to Victim 1 in an email on March 28, 2014 (summarized above). In addition, the Waybill for the art shipment listed this number for BRUGNARA. On or around April 16, 2014, Victim 1 received the following text message from this number:

> "[Victim 1], you freely gave me these items April 7th because you were downsizing and wanted me to have them…also you know I lost $300k on the Renoir you sold me years ago…so you felt happy about me haing [sic] these items…your attorney forwarded to my attorney invoices which were never given to me from you…as you gave me these items as a gift you know there was no sale, or written or verbal sale agreements…Moreover your values on those invoice documents…are not accurate regarding values, notwithstanding you giving the items to me as a gift…For example, the deKoonong [sic] Foundation…does not recognize, or accept, the pieces as authentic…nor does Sothebys…so they have no commercial value…The Degas…is a Russian reproduction from 15 yrs ago of Degas original sculptures from 100 years ago…the Luks portrait, if authentic, is worth 30k-50k according to Sothebys…the Miro and Picasso prints are unpublished and have no commercial vslue [sic]…In short, the actual commercial value of the gift received…is approximately $100K-$120K total. This is the gift valuation I will use for my records…Luke"

## BRUGNARA'S CRIMINAL HISTORY

9. On April 3, 2008, BRUGNARA was indicted in the Northern District of California on three counts of Filing a False Tax Return (Title 26, U.S. Code 7206). On January 12, 2010, a Superseding Indictment was filed against BRUGNARA charging him with three counts of Filing a False Tax Return and one count of Obstructing the Administration of Internal Revenue Laws (Title 26, U.S. Code 7212). The case number for this case is 08-CR-00222.

10. On April 9, 2008, BRUGNARA was indicted in the Northern District of California on two counts of False Statements (Title 18, U.S. Code 1001) and four counts relating to violations of the Endangered Species Act (Title 16, U.S. Code 1538(a)(1)(G) and 1540(b)(1)). The case number for this case is 08-CR-00236.

11. BRUGNARA pleaded guilty in both cases on January 26, 2010. On May 24, 2010, BRUGNARA was sentenced in case 08-CR-00222 to 30 months imprisonment and one year of supervised release and ordered to pay $1,904,625.35 in restitution. On May 26, 2010, BRUGNARA was sentenced in case 08-CR-00236 to 15 months imprisonment to be served concurrently with the sentence he received in case 08-CR-00222.

12. According to the "Inmate Locator" on the Bureau of Prisons (BOP) website, BRUGNARA was released from BOP custody on August 17, 2012.

13. BRUGNARA represented to Victim 1 in March and April 2014 that he had the means and intent to purchase approximately $11 million worth of art and that he was buying the art for his museum. Information BRUGNARA provided to U.S. Probation officers and the court as part of case 08-CR-00222 told a different story with respect to BRUGNARA's financial condition and art collection, as summarized below:

   a. On February 7, 2013, a U.S. Probation Officer submitted an "Assessment of Defendant's Financial Condition and Ability to Pay Restitution" to the court with respect to BRUGNARA in case number 08-CR-00222. In the report, the officer wrote:

      i. "Based upon my observations and review of the records and documents submitted...by Luke Brugnara, Luke Brugnara has no assets whatsoever, with the exception of a bank account with a nominal sum and a few personal items of inconsequential value..."

      ii. "The house which Luke Brugnara resides is currently under foreclosure...The house is in disrepair and its interior furnishing [sic] are very ordinary and include well worn furniture and nothing of observable value..."

      iii. "...There were artwork [sic] with large values which were sold to payoff [sic] the lenders pursuant to motions by the US Trustees. The art collection which was owned by the corporate entities was sold off to pay off the lenders who had liens on the art. Luke Brugnara currently owns no artwork whatsoever..."

      iv. "Luke Brugnara has calculated his net worth as zero based upon no assets and some pending liabilities and has filed with the US Probation Office a sworn declaration stating this fact. His wife Kay has no assets either and has borrowed money from friends and family to pay basic living expenses..."

      v. "In summary, Luke Brugnara's current financial condition is indigent status; zero net worth. Luke Brugnara has no ability whatsoever to pay any restitution amount..."

      vi. "Based upon my observations and review of the facts, Luke Brugnara has been economically destroyed by the felony conviction...and can no longer earn any significant amount of money due to his inability to borrow money...Luke stated he may try to seek employment as a track and field coach..."

   b. On March 29, 2013, a signed "Declaration of Defendant or Offender Net Worth & Cash Flow Statements" was filed as part of case 08-CR-00222. I reviewed the document and found the following:

      i. The document was executed by BRUGNARA on January 8, 2013 with the acknowledgement that, "I declare under penalty of perjury that the foregoing is true and correct."

  ii. In the "Net Worth Statement," BRUGNARA listed one bank account with a balance of $110. BRUGNARA wrote "NONE" under every other asset category, including "Other Assets" which included "art, paintings…collectibles, antiques…"

  iii. Under "Your Salary/Wages" on the "Monthly Cash Flow Statement," BRUGNARA listed $1200 in gross income and $900 in net income. BRUGNARA wrote "NONE" for all other sources of income on the statement. After expenses, BRUGNARA showed a "Net Monthly Cash Flow" of $0.

c. On October 22, 2013, BRUGNARA was found guilty in connection with two violations of the terms of his supervision for "Failure to truthfully answer inquiries by the probation officer" on January 8, 2013. The resulting sentence was one day in custody and 364 days of supervised release.

d. On April 29, 2014, a "Report on Offender Under Supervision" was filed by a U.S. Probation Officer in connection with case 08-CR-00222. The report cited the court's finding from October 22, 2013 that BRUGNARA "lied about his ownership in Brugnara Properties VI and VII and lied that he had access to only one bank account." The accompanying document entitled, "Petitioning the Court to Take Judicial Notice" cited the following:

  i. "There is probable cause to believe that the offender violated Special condition number one which states that the defendant shall pay any restitution, fine and special assessment that is imposed…Mr. Brugnara submitted two $50.00 payments in [sic] November 26, 2013. He did not make any additional payments toward his restitution until April 2014, when I informed him that a petition for violation will be filed against him for failure to pay his restitution…"

  ii. "Mr. Brugnara did not submit his Monthly Supervision Reports (MSR) for [November 2013 through March 2014]…Mr. Brugnara insisted that he did submit his MSR and blamed the probation office for misplacing them…"

  iii. "There is probable cause to believe that the offender violated standard condition number three, which requires him to answer truthfully all inquiries by the probation officer…"

  iv. "Mr. Brugnara has been on supervised release since October 23, 2013. He reports that he has been working at Brugnara Properties VI, and has earned no income to date…Mr. Brugnara reportedly survives on money borrowed from his friends and family…"

  v.

C.  Overview of the Basis for Search Warrants

## THE TARGET RESIDENCE

14. The Target Residence has been linked to BRUGNARA in a variety of ways. Public records show the property is owned by "Brugnara Properties VI." BRUGNARA represented the Target Residence to be his home to U.S. Probation and to the Court on multiple occasions during the course of his supervised release period as part of case 08-CR-00222.

15. BRUGNARA provided the address of the Target Residence for delivery of the artwork in multiple emails to Victim 1. Victim 1 was present at the Target Residence when the art arrived and met with BRUGNARA at the Target Residence. Victim 1 observed the artwork being placed in the garage of the Target Residence. The shipping Waybill shows the address for the Target Residence as being the delivery location for the five crates of art.

16. On April 24, 2014, BRUGNARA's attorney RK sent photographs and dimensions of four crates that he represented were those that were delivered to BRUGNARA on April 7, 2014. RK represented the four crates were still in BRUGNARA's possession as of April 24, 2014.

D.  Conclusion

17. Based upon the foregoing, I believe there is probable cause to believe BRUGNARA has conducted a scheme to defraud, in violation of Title 18, United States Code, Section 1341. As such, I have probable cause to believe the Target Residence contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1341. Accordingly, I respectfully request an arrest warrant authorizing the arrest of BRUGNARA and a search warrant authorizing the search of the Target Residence as described in Attachment A for the items described in Attachment B.

E.  Request for Sealing

18. Because this investigation is continuing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the entire file in this matter be sealed until further order of the Court.

_____
JEREMY DESOR
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before me
this 27th day of May 2014
_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The Target Residence is located at 224 Sea Cliff Avenue, San Francisco, California, and is further described as follows:

The Target Residence is a salmon-colored multi-story single-family home located on the north side of Sea Cliff Avenue just west of 27th Avenue in San Francisco. The home has a short driveway and two light-colored garage doors on the front of the house. There is a basketball hoop hanging above the garage doors. There is a porch above the garage with doors to access the porch visible on the second floor. There is a dark-colored animal figurine that appears to be a bull mounted on a wall outside of the house to the left of the garage. There is a dark-colored plaque under the animal figurine that appears to read "Cala Del Toro" and "224 Sea Cliff." There is a light-colored gate to the left of the garage at a 90-degree angle to the wall with the animal figurine and plaque. There is a "No Trespassing" sign hanging on the gate. There is a satellite dish mounted on the upper right-side of the house above the porch. There is a salmon-colored wall to the left of the driveway along the sidewalk.

# ATTACHMENT B

# ITEMS TO BE SEIZED

The items set forth in this Attachment are evidence, fruits, and instrumentalities of mail fraud, in violation of Title 18, United States Code, Section 1341.

For the time period of August 2012 (BRUGNARA's release from federal prison) to present:

1. Art, including but not limited to paintings and sculptures, any materials used to store or to transport art, and any records relating to art.

2. Bank and financial institution (including trade or brokerage account) records, documents, and materials, including, but not limited to, loan agreements, mortgage records, line of credit agreements, periodic statements, deposit receipts, records of wire transfers, checks, cashier's checks, drafts, notes, acceptances, traveler's checks, letters of credit, safety deposit box records, money orders, check ledgers, certificates of deposit, checkbooks, cash, credit cards, debit cards, negotiable instruments, and/or any documents reflecting receipt or disbursement of funds.

3. Diaries, calendars, and appointment books.

4. Address books, telephone directories, and contact databases.

5. Articles of Incorporation, bylaws, lists of Officers and Directors, ownership records, state business licenses, tax returns filed, corporate minutes, notes, and documents related to any iteration of Brugnara Properties.

6. Telephone records for all telephones of any type, including but not limited to bills, receipts for payment, installation records and/or service records.

7. Records, documents, and materials related to the accounting process including general journals and entries, general ledgers, accounts and notes receivable, accounts and notes payable, case receipt and disbursement records, sales records, tax records, payroll journals and ledgers, purchase

journals, charts of accounts, profit and loss statements, and balance sheets.

8. Income tax returns and related documents such as 1099's.

9. Cash in amounts over $1,000 as well as records, documents, and materials relating to cash in amounts over $1,000, including amounts of cash payments, services rendered in exchange for cash, and the disbursement of cash.

10. Investment and/or loan records of any kind, including but not limited to, promissory notes, stock certificates, loan agreements, investment agreements, and/or contracts memorializing investments or loans made by or with Luke Brugnara or any related businesses.

11. Correspondence and communications in written or electronic form, including but not limited to, letters, faxes, emails, proposals, agreements, contracts, and records, to or from Luke Brugnara or any iteration of Brugnara Properties.

12. Records or materials relating to museums, whether existing or planned.

13. Documents or communications relating to e-mail and text services used by Luke Brugnara.

14. Cellular telephone(s), pursuant to the protocol described in Attachment C.

15. Any computers, computer hardware, computer software, computer documentation, passwords, or data security services, including but not limited to desktop computers, laptop computers, and other devices capable of sending or receiving e-mail, pursuant to the protocol described in Attachment C.

# **ATTACHMENT C**

PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY

1.      In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically (the device) reasonably can be completed at the location listed in the warrant (the site) within a reasonable time.   If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.      If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site.   The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.      In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.      When the government removes a device from the searched premises it may also remove any equipment or documents (related equipment or documents) that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.      When the government removes a device or related equipment or documents

from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

      6.     Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

      7.     The time periods set forth in this protocol may be extended by court order for good cause.

      8.     In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

      9.     For the purposes of this search protocol, the phrase "to preserve evidence is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

# DEFINITIONS FOR ATTACHMENTS B AND C

The terms "records," "documents," and "materials" include all of the items described in Attachments B and C in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, compact flash cards, smart media cards and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.